# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
|  | : |  |
|  | : |  |
| IN RE MIRANT CORPORATION | : | CIVIL ACTION NO. |
| SECURITIES LITIGATION | : | 1:02-CV-1467-RWS |
|  | : |  |
|  | : |  |

## <u>ORDER</u>

This case comes before the Court on the following motions: (i) the Second

Motion to Dismiss of the Individual Defendants[1] [325]; (ii) Defendant James A.

Ward's Second Motion to Dismiss [326]; (iii) Defendant Southern Company's

Second Motion to Dismiss [328]; (iv) the Second Motion to Dismiss of the

Director Defendants[2] [329]; and (v) the Second Motion to Dismiss of the

---

[1] The Individual Defendants in this action include S. Marce Fuller, Raymond D. Hill, Richard J. Pershing, A.W. Dahlbert, and James A. Ward, although Defendant Ward has filed his own Motion to Dismiss.

[2] The Director Defendants are H. Allen Franklin, Elmer B. Harris, and W.L. Westbrook.

Underwriter Defendants[3] [330].  After reviewing the record, the Court enters the

following Order.

## Background

This is a consolidated securities class action.  Plaintiffs bring claims under

Sections 11 and 15 of the Securities Act of 1933 15 U.S.C. §§ 77k and 77o

(hereinafter the "Securities Act"), and under Section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b) (hereinafter the "Exchange Act"), and

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  With regard to their

Exchange Act/Rule 10(b) claim, Plaintiffs seek to represent a class of individuals

who purchased Mirant stock between September 26, 2000, and September 5, 2002.

With regard to their Securities Act claim, Plaintiff Kellner seeks to represent a

subclass of individuals who purchased the securities of Mirant Corporation

between September 26, 2000, and April 2, 2001.[4]

---

[3] The Underwriter Defendants are Goldman, Sachs & Co., Morgan Stanley Dean Witter, Banc of America Securities, LLC, Credit Suisse First Boston Corp., J.P. Morgan Securities Inc., Lehman Brothers Inc., Salomon Smith Barney Inc., ABN AMRO Incorporated, Blaylock & Partners, L.P., Chase Securities Inc., Commerzbank Aktiengesellschaft and The Williams Capital Group, L.P. (collectively referred to herein as the "Underwriters").

[4] By Order of August 5, 2008 [312], the Court ruled that Plaintiffs' Securities Act claims are limited to stock purchases on or prior to November 2, 2000, unless an individual Plaintiff can demonstrate that, on the date of purchase after November 2, 2000,

## I.    Summary of Factual Allegations

Plaintiff's Second Amended Complaint alleges a series of statements and omissions released by Mirant and its officers that Plaintiffs claim misled investors and artificially increased the value of the securities of Mirant Corporation. The factual allegations relied upon in this Order derive from Plaintiffs' Corrected Consolidated Second Amended Class Action Complaint [318] (hereinafter "SAC") and other undisputed documents properly before the Court.

For ease of reference, both the Court and the parties group Plaintiffs' allegations into three categories.

### A.    California Market Manipulation Claims

Plaintiffs first allege that Defendants materially misstated or failed to disclose material information relating to Mirant's energy trading activities during the energy crisis that affected the State of California in the summers of 2000 and 2001. Specifically, Plaintiffs allege in the SAC that "Mirant engaged in a variety of schemes to manipulate the California market . . . which allowed it to inflate falsely its revenues and net income. (SAC ¶ 24.)

---

he or she purchased more shares than the total amount of shares that entered the market pursuant to the EBP Registration Statement. (See Order of Aug. 5, 2008 at 36-38.)

AO 72A
(Rev.8/82)

The Complaint begins by describing the history of the deregulation of the energy market in California in some detail. (SAC ¶¶ 25-35.) According to Plaintiffs, the absence of regulatory oversight allowed Mirant energy traders to engage in a series of schemes and tactics—all of which Plaintiffs conclusively label as illegal—to manipulate the price of energy. "The fundamental goal of all of the strategies," alleges the Complaint, "was to create a perception of scarcity by making less energy available in the day-ahead markets (when there was time to react and buyers had the ability to guard against high prices through sloping demand curves) and to instead sell power at the last minute, when the need for energy to keep the lights on trumped other considerations." (SAC ¶ 36.)

The Complaint relies upon allegations and "expert testimony" made in an action brought by the Federal Energy Regulatory Commission ("FERC") (SAC ¶¶ 39-40, 49, 53-58, 67-68); the testimony of various anonymous former Mirant low- and mid-level employees and the intercepted communications of various Mirant energy traders (SAC ¶¶ 52, 58, 63, 64, 66, 70); internal memoranda and emails written by low-level Mirant employees (SAC ¶¶ 62, 80-82); and the internal memoranda of other energy companies trading on the California market, including Enron. (SAC ¶¶ 36, 50.)

4

Based on these sources, Plaintiffs allege that Mirant traders employed "Enron-style" energy trading schemes, such as using the "Death Star" strategy to simultaneously import and export power to strain supply capacity (SAC ¶ 38); "inc-ing,"[5] (SAC ¶ 40), "ex-post" and "congestion" gaming[6] (SAC ¶¶ 43, 51, 53), "loop-to-looping" (SAC ¶ 44), "wash trades,"[7] (SAC ¶¶ 63-64), and "ricochet trades,"[8] (SAC ¶ 65), to artificially increase energy prices and reap purportedly

---

[5] "Inc-ing" is artificially increasing the load on the schedule submitted to the energy auction system operator so that the operator would pay an artificially inflated prices of the excess of generation over the scheduled load on the actual "real-time" market. (See SAC ¶ 40.)

[6] Congestion gaming is a scheme by which traders reap profits by artificially creating congestion in the energy market and counter-trading at an artificially increased price to offset congestion. Plaintiffs allege that in July of 2000, a Mirant trader was recorded in a conversation asking another energy trader "if he wants 'to do an ex-post type of game or you want to do a congestion type of game plus ex-post.'" The Mirant trader expressed concern about "'crush[ing] the market too bad,'" but suggested that the traders "'try to benefit from trying to reliev[e] some of that Path 26 congestions.'" (SAC ¶ 54.)

Ex-post trading, on the other hand, manipulates the energy market in the opposite way, by falsely creating a perceived shortage in the market and then selling energy at the last minute without having gone through the normal bidding process. (See, e.g., SAC ¶¶ 57-58.)

[7] Wash trades are inter-company trades whereby Mirant sells a specified amount of energy at a specified price and then purchases it back in the same amounts and at the same price. (See SAC ¶¶ 63-64.)

[8] Ricochet trades are inter-company trades whereby Mirant sells energy to another company outside of California and then re-imports the same energy by repurchasing it from the company at a higher price. It then sells the energy into the California market presumably at an even higher price. (See SAC ¶ 65.)

AO 72A
(Rev.8/82)

illegal profits. Plaintiffs also allege that employees of Mirant intentionally shut down operable power plants, after falsely claiming that they required maintenance, to restrict the supply and raise the price of energy. (SAC ¶¶ 37, 70, 72-74, 94-98.) Although the Complaint alleges that these improper trading activities were "widespread" within Mirant, it does not allege how many Mirant traders were involved in the purportedly illegal trading schemes and how much of Mirant's California revenues were derived therefrom. As best as can be told from the Complaint, of approximately 500 traders on Mirant's Atlanta trading floor, between 40 and 50 worked primarily on California energy trades, but it is unclear how many engaged in the allegedly illegal trading. (SAC ¶ 106.)

According to the Complaint, between August 2001 and February 2002, Mirant's "management," including the director of the IT Department and the director of the Legal Department, instructed certain employees to begin deleting certain employees' hard drives. (See SAC ¶¶ 102-114.) Citing the testimony of a confidential informant, Plaintiffs allege that "the focus of the 'cleaning' project was on Company employees who dealt in any way with energy transactions in California, and all of these employees had 'red flags' on their computers." (SAC ¶ 106.) Defendant Fuller, "all senior executives, and 'a couple other VPs'"

including "VPs that sit down on the trade floor" were among those who were "specifically targeted" to have their computers "cleaned." (SAC ¶ 107.) The confidential informant was assigned the task of deleting company files, and was later offered $10,000 as part of a severance package "if he agreed to sign the agreement and 'not talk.'" (SAC ¶ 112.) The confidential informant was later approached by an individual who "placed a check for $10,000 on a table" and suggested that the confidential employee's failure to accept the check and sign the confidentiality agreement could result in his "be[ing] named as a defendant in the Mirant lawsuit because of his role in deleting the California files," which could "ruin [his] family." (SAC ¶¶ 113-14.)

Mirant's California energy trading practices in 2000 and 2001 have been the subject of numerous investigations (SAC ¶¶ 86-97) and various lawsuits brought by the Attorney General of the State of California seeking restitutionary penalties, see Attorneys for the People of the State of Cal. ex rel. Lockyer v. Mirant Corp., Case No. CGC 02-4054-29 (Sup. Ct., County of San Francisco, Mar. 11, 2002), alleging unfair competition, State of Cal. ex rel. Lockyer v. Mirant Corp., Case No.-02-2207-VRW (N.D. Cal. April 9, 2002), alleging violations of the Clayton Act, State of Cal. ex rel. Lockyer v. Mirant Copr., Case No. C-02-1787 (N.D. Cal.

AO 72A
(Rev.8/82)

Apr. 15, 2002); and alleging violations of rules of the Federal Energy Regulatory Commission ("FERC"), <u>State of Cal. ex rel. Lockyer v. British Col. Power Exchange Corp.</u>, 99 FERC ¶ 61, 247 (May 31, 2002).  Plaintiffs allege that all of these lawsuits were settled within a consolidated bankruptcy proceeding in which Mirant assigned a number of plaintiffs its accounts receivable balance of $320 million and an unsecured claim of $175 million.  (SAC ¶ 101.)  The plaintiffs in those action also agreed to withdraw their objections to the FERC trading practices settlement, which resulted in Mirant's payment of approximately $4 million to FERC.  (<u>Id.</u>)  No further details regarding the nature of the settlement is provided in the Complaint.  Plaintiffs do not allege, for example, that any finding was made in the bankruptcy proceeding that Mirant's conduct during the relevant time period was illegal.  Moreover, Plaintiffs also do not provide further detail concerning the results of any other investigations initiated by state or federal authorities that concluded that any of Mirant's conduct in the California energy market in the summers of 2000 and 2001 was illegal.[9]  In short, Plaintiffs do not allege that any

_____

[9] To be sure, Plaintiffs allege that in a proceeding before FERC relating to Mirant's compliance with federal reporting requirements, FERC issued an order on May 31, 2002, finding that Mirant and other sellers violated Section 205 of the Federal Power Act by failing to report transaction-specific information on their sales of power during California's energy crises.  (SAC ¶ 93.)  However, that investigation did not concern the legality or illegality of Mirant's trading practices in California during the relevant time

governmental agency that investigated Mirant's trading activities concluded that they were illegal under federal or state law.

According to Plaintiffs, on May 7, 2002, after documents were released implicating Mirant in a fraud perpetrated by Enron in California, Mirant common stock fell 12%, closing at $9.75. In the following six months, Mirant's stock continued to decline, closing at under $2 per share on November 15, 2002.

B.    WPD Impairment Claims

Second, Plaintiffs allege that Defendants misled investors by failing to recognize an impairment of its interest in a United Kingdom-based electric utility company, Western Power Distribution (hereinafter "WPD"), in which Mirant owned a 49% economic interest. (SAC ¶ 115.) Mirant retained operational and management control of WPD, and therefore consolidated the financial results of WPD with its own. (SAC ¶ 116.)

*1. Fourth Quarter/1999 10-Q.* According to the Complaint, in December 1999, British regulators implemented rate reductions that had the effect of reducing distribution prices by 20% beginning April 1, 2000, followed by a further reduction of 3% each year after April 1, 2001. Mirant's joint venturer in WPD, the

_____

period.

PPL Corporation, recorded a $36 million impairment loss in connection with its investment in WPD. (SAC ¶ 118.) However, Mirant did not similarly do so. Plaintiffs allege that, "[d]espite the obvious major impact that this regulatory action would have on the future income stream of WPD, Mirant failed to conduct an impairment test as required by FASB Statement No. 121, which was triggered by the regulatory rate change and, thus, the reported financial results [beginning in the fourth quarter of 1999 and ending second quarter of 2002 when Mirant eventually wrote WPD down] failed to conform to GAAP." (SAC ¶ 117.) Plaintiffs allege further that Mirant and the Individual Defendants were aware of their obligation to perform an impairment test because "they did perform a FASB 121 mandated impairment analysis in 1999 regarding WPD's metering assets, which resulted in a $31 million write-down of those assets." (SAC ¶ 121.)

2. *Fourth Quarter 2001/10-Q.*  In addition to failing to record a $36 million impairment loss in the fourth quarter of 1999, Plaintiffs allege that Defendant Ward committed securities fraud when he failed to record a $117 million impairment charge to WPD in the fourth quarter of 2001. PPL, on the other hand, recorded a $117 million impairment charge that quarter. (SAC ¶ 129.) Plaintiffs allege that, "despite the fact that PPL had actually informed Mirant of its intent to

impair its investment in WPD by an additional $117 million before it did so on

January 30, 2002 . . . Mirant misrepresented its financial condition to investors by

assigning a falsely inflated carrying value of approximately $475 million of its

49% interest in WPD." (SAC ¶ 130.) Plaintiffs claim that "Mirant failed to

conduct any meaningful analysis of WPD's fair value or to evaluate whether any

resultant decline in WPD's value was other than temporary." (SAC ¶ 133.)

Instead, Plaintiffs claim, "Mirant engaged in an *ad hoc* analysis," which was

conducted as explained in a memorandum written by Dave Cathcart, Mirant's

Director of Accounting Policy and Analysis. (SAC ¶ 134.) In the memorandum,

Cathcart stated that PPL had estimated the fair market value of WPD, as a whole,

to be between $400 million and $1 billion (thus, PPL estimated Mirant's share of

49% between approximately $200 and 500 million). PPL estimated its own share

at $328 million—at the midpoint of the estimate range—after taking a $117

million reduction. Cathcart concluded that Mirant's prior estimate of its share at

$425 million was within PPL's range of estimates, and therefore there was no

"compelling" evidence that an impairment needed to be recognized. (SAC ¶¶ 134-

38.) Plaintiffs allege that Cathcart's analysis was flawed under the pertinent

accounting rule for that reason and "because it ignored the fact that Mirant had

11

determined in December of 2001 that it would probably sell WPD during 2002, meaning that any decline in value was other than temporary and that a write-down of the carrying value of WPD was required." (SAC ¶ 137.)

3. *July 30, 2002, Earnings Release*. Finally, Plaintiffs allege that Mirant issued a false or misleading earnings release when it announced on July 30, 2002, that it had written down the carrying value of WPD by $284 million because it intended to sell its interest in WPD later that year. At the time, Mirant reported its estimate of the fair market value of WPD at $290 million. On September 6, 2002, however—slightly over one month later—Mirant announced that it had sold WPD to PPL for $235 million, $45 million less than it had valued its asset. (SAC ¶ 148.) Plaintiffs allege that the sale revealed the fraud underlying its previous writedown announcement on July 30, 2002. In the end, Mirant recognized a $326 million impairment of its interest in WPD from its valuation at $561 million in the fourth quarter of 1999 to its eventual sale for $235 million in September 2002.

C.    Accounting Restatement Claims

Plaintiffs also claim that Defendants misled investors by filing false financial reports with the Securities & Exchange Commission dating back to the formation of Mirant in 2000. Plaintiffs allege that Defendants engaged in a series

of accounting manipulations described by former Mirant employees and contractors in which revenues on energy transactions were overstated as a result of deficiencies in Mirant's accounting controls and organization. (SAC ¶¶ 153-181.) Despite receiving notice of these errors, accounting executives allowed these errors to go uncorrected. (SAC ¶¶ 159-77.) Plaintiffs allege that when the accounting firm KPMG was asked to audit Mirant's revenue records, corrections were made only to the one month reviewed by KPMG. (SAC ¶ 164.) Plaintiffs also allege that Mirant overstated "a gas inventory asset" by $85 million.

In July of 2002, Mirant announced a "review" of "several accounting issues," which eventually led Mirant to restate its financial statements in November of 2002 for the periods ending December 31, 2001 and March 30, 2002. At the time, Mirant also disclosed that it may discover "other accounting errors" dating back to early-2000.

Plaintiffs also provide an additional group of allegations not included in prior complaints concerning Mirant's accounting practices during the Class Period. Plaintiffs allege that "Southern and the Individual Defendants caused Mirant to grossly overpay for power plant and other energy assets that it acquired, both prior and subsequent to the Company's IPO, and Mirant incurred billions of dollars of

13

excessive debt in order to pay for those acquisitions." (SAC ¶ 182.) Plaintiffs allege that they "knowingly or recklessly concealed from the investing public information showing that Mirant had overpaid for many of its assets. . . . [and] had reckelessly incurred excessive amounts of short-term debt . . . ." (SAC ¶¶ 192, 209.)

## II.    Summary of Legal Claims

### A.    Counts I & II: Securities Act Claims

On April 21, 2000, Mirant issued a Prospectus and Registration Statement ("S/1-A") in advance of an initial public offering of stock it intended to pursue to raise public funds for the spin off of Mirant from Southern Company. Mirant then announced the closing of the IPO of 66.7 million shares of Mirant stock on October 3, 2000, grossing a total of approximately $1.81 billion from both the IPO and a concurrent preferred securities offering. (SAC ¶¶ 195-98.)

Plaintiffs allege that the IPO Prospectus and Registration Statement contained the three sets of fraudulent information described above. First, respecting the Accounting Restatement Claim, Plaintiffs allege that the Prospectus contained materially misleading financial disclosures, including an overstatement of $85 million of natural gas assets and an understatement of U.S. income tax on

14

Asia income, and failed to disclose that Mirant had significant internal control deficiencies, including deficiencies related to Mirant's systems and processes. (SAC ¶¶ 197-198.) Second, Plaintiffs allege the IPO Prospectus and Registration Statement, contained misleading statements concerning the value of WPD. (SAC ¶¶ 199-202.) Finally, Plaintiffs allege that the Prospectus was false and misleading because it "failed to disclose the true nature of Mirant's operations in the California energy market and the risks arising therefrom." (SAC ¶ 203.) The Complaint continues:

> Specifically, the financial statements in Mirant's IPO Registration Statement and Prospectus were materially misstated because they failed to provide for the return of illegally obtained revenue from Mirant's improper activities in the California energy market through a charge to earnings, and failed to provide for the professional fees associated with the investigations arising from the improper market conduct through a charge to earnings.

(SAC ¶ 203.)

Plaintiffs also allege that the IPO Registration Statement and Prospectus were misleading for failing to disclose the effects of its illegal activities and for failing to disclose that its profits in California were not sustainable as a result of those activities. (SAC ¶¶ 204-05.)

AO 72A
(Rev.8/82)

Plaintiffs also allege that the IPO Registration Statement and Prospectus were misleading about "Mirant's plans and ability to implement information systems that would assist in controlling risks" because certain of those plans had been "delayed indefinitely" and the software was not functional. (SAC ¶¶ 206-07.) Finally, Plaintiffs allege that Mirant failed to disclose the effects of its overleveraging, as described above.

Count I, which is brought against the Individual Defendants, the Underwriter Defendants, and the Director Defendants, incorporates all allegations in the SAC, except it "expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based solely on claims of strict liability and/or negligence under the Securities Act." (SAC ¶ 466.) The SAC alleges that the IPO Registration Statement contained "materially false and misleading statements," that the Individual Defendants and Director Defendants participated directly in disseminating those statements, and that the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the IPO Registration Statement. (SAC ¶¶ 465-72.)

AO 72A
(Rev.8/82)

Count II alleges that the Mirant Individual Defendants and the Southern Company are liable under Section 15 of the Securities Act as "controlling persons" of Mirant.

B.    Counts III & IV: Exchange Act Claims

With regard to Count III, Plaintiffs allege that the Individual Defendants violated Section 10(b) of the Exchange Act by issuing the three sets of false and misleading statements discussed above between the time that they filed their IPO Registration Statement in October of 2000 and the beginning of 2002. Plaintiffs allege that the Individual Defendants overstated revenues, failed to account for an impairment of WPD from its valuation at $561 million in the fourth quarter of 1999 to its eventual sale for $235 million in September 2002, and failed to disclose material information concerning Mirant's misconduct during the summers of 2000 and 2001 in California. (SAC ¶¶ 480-90.) Count IV asserts controlling person liability under Section 20 of the Exchange Act against the Individual Defendants and the Southern Company.

III.    **Procedural History**

This Court's Order of August 5, 2008, contains a detailed description of the procedural history of this case leading to the entry of that Order. (See Order of

Aug. 5, 2008, at 11-16.)  In that Order, the Court granted Plaintiffs leave to correct deficiencies in their Complaint to comply with <u>Wagner v. First Horizon Pharm. Corp.</u>, 464 F.3d 1273, 1278 (11th Cir. 2006).  (Order of Aug. 5, 2008 at 19-24.) The Court also granted leave to Plaintiffs to amend their Complaint with respect to their allegations concerning the WPD impairment claim.  (<u>Id.</u> at 26 n.14.) Finally, the Court granted in part Defendants' Motion for Partial Summary Judgment, concluding that Plaintiffs did not have standing to pursue their claims arising under the Securities Act after November 2, 2000, unless that Plaintiff could demonstrate (as Plaintiff Kellner has alleged) that he or she purchased more shares than had entered the market pursuant to the EBP Registration Statement.

Following the entry of that Order, Plaintiffs have filed their Corrected Second Amended Consolidated Class Action Complaint.  Defendants, in turn, have moved to dismiss Plaintiffs' claims.

## Discussion

All Defendants move to dismiss Plaintiffs' claims, contending that (i) they are time-barred; (ii) fail to allege a material misstatement or omission under the Securities Act or Exchange Act; and (iii) fail to allege loss causation.  The

AO 72A
(Rev.8/82)

Individual Defendants[10] further contend that Plaintiffs have failed to allege scienter with the particularity required to sustain their Exchange Act claims. The Southern Company and Director Defendants also contend that Plaintiffs have failed to sufficiently allege "controlling person" liability under either the Securities Act or Exchange Act.

After reviewing the standard applicable to a motion to dismiss and the special pleading requirements in a securities fraud case, the Court takes up those Motions. For the reasons that follow, the Court concludes that further factual development is required to determine whether Plaintiffs' claims are barred by the statute of limitations. Nevertheless, because none of Plaintiffs' claims state a primary violation of the Securities Act or Exchange Act, the Court grants Defendants' Motions.[11]

---

[10] Individual Defendants Fuller, Hill, and Pershing have filed a separate Motion from Individual Defendant Ward. Nevertheless, Defendant Ward incorporates the arguments of Defendants Fuller, Hill, and Pershing in his memorandum, and the Court therefore addresses the arguments of the Individual Defendants together unless otherwise stated.

[11] As a result of the Court's disposition below, the Court does not reach Defendants' arguments concerning loss causation or whether Plaintiffs' have sufficiently alleged control for purposes of its "controlling liability" claims.

## I.    Motion to Dismiss Standard

Normally, a complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a plausible claim for relief.  Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965-66, 167 L. Ed. 2d 929 (2007); Fed. R. Civ. P. 12(b)(6).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.  See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983).  However, complaints that allege fraud must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires that in alleging fraud the circumstances constituting fraud must be stated with particularity.  "A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud."  In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1347 (N.D. Ga. 2000) (citing Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).

AO 72A
(Rev.8/82)

In ruling on a motion to dismiss in a case alleging securities fraud, the court may consider evidence outside the pleadings so long as the plaintiff relies on it and its authenticity has not been questioned. Harris v. Ivax Corp., 182 F.3d 799, 802 n. 2 (11th Cir. 1999); Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997). Additionally, district courts may judicially notice any relevant documents publicly filed with the SEC. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999).

## II.    Statute of Limitations

The Individual Defendants, along with the Director Defendants and Underwriter Defendants, first contend that Plaintiffs' Market Manipulation Claims (which are brought both under the Securities Act and Exchange Act) are barred by the applicable one-year statute of limitations on the ground that Plaintiffs were on inquiry notice of the alleged fraud as early as October 20, 2000. Citing Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1279 (11th Cir. 2005) (Tello I), this Court previously ruled that a fact question exists as to whether Plaintiffs were on inquiry notice prior to one year before bringing their Market Manipulation claims. (Order of March 6, 2007 at 5-21.) However, citing the second appeal in the Tello case, Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 971-974 (11th Cir. 2007)

21

("Tello II"), which was handed down after this Court's 2007 decision, Defendants request reconsideration of this issue. They contend, in effect, that the Eleventh Circuit in Tello II retrenched back to its earlier inquiry-notice jurisprudence—reinstating the standard which led Judge Martin to initially dismiss Plaintiffs' Market Manipulation claims. The Court disagrees and declines to resolve the question of inquiry notice at this juncture in the proceeding.

In support of their argument, Defendants point out that Plaintiffs themselves allege a series of storm warnings that occurred over a year before bringing this lawsuit in May of 2002. For example, Plaintiffs allege that on October 20, 2000, "utility consultant Robert McCullough released a report presenting evidence that independent power generators in California withheld power from the California market in order to maintain artificial scarcity and high prices." (See SAC ¶ 314.) Plaintiffs also allege that, on November 22, 2000, Southern California Edison released a report disclosing that it had evidence that electricity generators, including Mirant, withheld power from the California wholesale power market. (SAC ¶¶ 316-21). According to Defendants, these facts and others alleged by Plaintiffs constituted storm warnings that should have led Plaintiffs to investigate their Market Manipulation claims.

But the presence of storm warnings is not the end of the inquiry. As the Eleventh Circuit made clear in both Tello I and Tello II, inquiry notice is not triggered at the moment storm warnings are present. Although storm warnings may trigger a duty to investigate, "inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), *to ascertain the information needed to file suit*." Tello I, 410 F.3d at 1284 (quoting Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 368 (7th Cir. 1997)) (emphasis added); see also Tello II, 494 F.3d at 968 ("Inquiry notice in our circuit occurs when there is factual evidence of the possibility of securities fraud that would cause a reasonable person to investigate whether his or her legal rights had been infringed. . . . Once inquiry notice occurs, a prospective plaintiff enters a period of reasonable diligence, which is the time necessary, exercising ordinary investigation, to ascertain sufficient facts to file a complaint."). In other words, even if a plaintiff is exposed to "storm warnings" that disclose the possibility of securities fraud, the clock does not run until a reasonable investor is "able to plead a reasonably well substantiated and adequately particularized case of securities fraud, bearing in mind that before he files suit he will not have the aid of compulsory process." Tello I, 410 F.3d at 1284 (quoting Fujisawa Pharm. Co.

v. Kapoor, 115 F.3d 1332, 1335-37 (7th Cir. 1997)). While "the facts that put the victim of the fraud on notice can fall short of actual proof of fraud," it is "suspicious circumstances, *coupled with ease of discovering . . . whether the suspicion is well grounded*[, that] may cause the statute of limitations to start to run before the plaintiffs discover the actual fraud." Id. (quoting Fujisawa, 115 F.3d at 1335-37) (emphasis added); Tello II, 494 F.3d at 973-74 (discussing sufficient information available to file securities fraud suit with requisite detail to survive Rule 9(b) and particularity requirements).

After full consideration of the arguments Defendants raise in support of reconsideration, the Court remains of the view that, at the very least, the second prong of the inquiry notice standard elucidated in Tello I and Tello II—namely, *when* an investigation could have reasonably been concluded to enable Plaintiffs to file suit—cannot be determined based on Plaintiffs' Complaint alone. Further factual development is required to decide that question. Accordingly, the Court declines Defendants' request to hold as a matter of law that Plaintiffs' Market Manipulation claim is barred by the statute of limitations.

24

## III.    The Legal Framework of Plaintiffs' Claims

Defendants next argue that, even if timely, Plaintiffs' claims fail to state a violation of the Securities Act and Exchange Act.  Before turning to the merits of Plaintiffs' allegations, it is helpful to begin with a discussion of the legal framework of the claims asserted by Plaintiffs and the special pleading rules that are applicable in this case.

### A.    Securities Act

Count One of the SAC, brought against the Individual Defendants, the Underwriter Defendants, and the Director Defendants, asserts a primary violation of § 11 of the Securities Act, which provides, in relevant part, as follows:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—
>
> > (1)    every person who signed the registration statement;
> >
> > (2)    every person who was a director of . . . the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

25

AO 72A
(Rev.8/82)

(3)     every person who, with his consent, is named in the registration statement as being or about to become a director . . . ;

(4)     every accountant . . . or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement . . . ;

(5)     every underwriter with respect to such security.

15 U.S.C. § 77k(a).

Section 11 of the Securities Act imposes liability on persons preparing and signing materially misleading registration statements.  15 U.S.C. § 77k(a).  A registration statement can be misleading either by containing an untrue statement or by omitting facts that are necessary to prevent other statements from being misleading.  Id.  There is no state-of-mind element to a § 11 claim, and liability is "virtually absolute, even for innocent misstatements."  Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S. Ct. 683, 687, 74 L. Ed. 2d 548 (1983).  Neither allegations of fraud nor scienter are necessarily part of a Securities Act claim.  Id.

Some of Plaintiffs' Securities Act allegations are premised on omissions of material facts.  "To avoid dismissal of a section 11 omission claim, plaintiffs must

properly allege: 1) the prospectus contained an omission; 2) the omission was material; 3) defendants were under a duty to disclose the omitted material information; and 4) that such information existed at the time the prospectus became effective." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1189 (11th Cir. 2002). Although claims brought under the Securities Act are not normally required to be pled with particularity, claims that "sound in fraud" must meet the particularity requirement of Rule 9(b). Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1277 (11th Cir. 2006); see also Order of Aug. 5, 2008, at 19.

Count Two of the SAC, brought against the Individual Defendants and Southern Company, alleges "controlling person" liability under § 15 of the Securities Act, which extends Section 11 and 12 liability to persons who control entities liable under those sections. Section 15 provides, in relevant part, as follows:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [§§ 11 or 12 of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

27

15 U.S.C. § 77o.

B.    <u>Exchange Act</u>

Count Three of the Amended Complaint, which is brought against the

Mirant Individual Defendants, alleges violations of § 10(b) of the Exchange Act,

which provides, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce or of the
> mails, or of any facility of any national securities exchange—
>
> . . .
>
> (b)    To use or employ, in connection with the
> purchase or sale of any security registered on a national
> securities exchange . . . any manipulative or deceptive
> device or contrivance in contravention of such rules and
> regulations as the [Securities and Exchange]
> Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Count Three of the Amended Complaint also alleges violations

of Rule 10b-5, which provides, in relevant part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce, or of the
> mails or of any facility of any national securities exchange,
>
> (a)    To employ any device, scheme, or artifice to defraud,
>
> (b)    To make any untrue statement of a material fact or to
> omit to state a material fact necessary in order to make the statements

AO 72A
(Rev.8/82)

made, in the light of the circumstances under which they were made, not misleading, or

      (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Under these provisions, an Exchange Act claim has six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005); Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236-39 (11th Cir. 2008). The special pleading requirements imposed by Rule 9(b) and the Private Securities Litigation Reform Act are discussed further below.

Count Four of the Amended Complaint, which is brought against the Individual Defendants and Southern Company, alleges liability under § 20(a) of the Exchange Act, which provides, in relevant part, as follows:

      Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with

and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To state a claim under § 20(a), Plaintiffs must allege three elements: (1) that there was a primary violation of the securities laws; (2) that the Individual Defendants and Southern Company had the power to control the general business affairs of Mirant; and (3) that the individual defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001) (quotation marks omitted).

C.    Heightened Pleading Requirements For Exchange Act Claims

Although ordinarily a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," see Fed. R. Civ. P. 8(a)(2), Rule 9(b) of the Federal Rules of Civil Procedure requires a complaint of securities fraud "to state with particularity the circumstances constituting fraud." Id. Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and

30

the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." Mizzaro, 544 F.3d at 1237 (quoting Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007)).

In 1995, "[a]s a check against the abusive litigation by private parties," Tellabs, Inc. v. Makor Issues & Rights, Ltd. __ U.S. __, 127 S. Ct. 2499, 2504, 168 L. Ed. 2d 179 (2007), Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), which requires plaintiffs to plead securities fraud with an added layer of particularity. Under the PSLRA's heightened pleading requirements, any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The complaint must allege facts supporting a strong inference of scienter "for each defendant with respect to each violation." Phillips v. Scientific-Atlanta, Inc., 374

31

F.3d 1015, 1016 (11th Cir. 2004). Failure to do so requires dismissal. <u>See</u> 15 U.S.C. § 78u-4(b)(3)(A). ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.").

In sum, as it applies to Plaintiffs' claims of securities fraud under Section 10(b) of the Exchange Act, Plaintiffs must provide particularity with respect to both their allegations of material misrepresentations and their allegations of scienter.

    D.    <u>Securities Act Claims that "Sound in Fraud"</u>

Although claims brought under the Securities Act are not normally required to be pled with particularity, Plaintiff's Securities Act claims against the Individual Defendants in this case must also comply with the particularity requirement of Rule 9(b) because, as Plaintiffs concede, those claims "sound in fraud." <u>Wagner</u>, 464 F.3d at 1277; <u>see</u> <u>also</u> Order of Aug. 5, 2008, at 19. Therefore, it is not disputed that, to sustain their claims brought against the Individual Defendants under both the Securities Act and Exchange Act, Plaintiffs must assert all of their allegations with particularity. Whether Plaintiffs must also plead their Securities Act claims against the Underwriter Defendants and Director Defendants was the

AO 72A
(Rev.8/82)

subject in this Court's prior Order of August 5, 2008, and is a subject the parties

continue to dispute. The Court addresses that issue in more detail below.

**IV.   The Securities Act Claims Brought Against the Underwriter Defendants and Director Defendants Sound in Fraud.**

The Underwriter Defendants and Director Defendants move to dismiss

Plaintiffs' Securities Act claims for largely the same reasons as do the Individual

Defendants. They argue, in part, that Plaintiffs' claims against them must be

particularized under Rule 9(b) and Plaintiffs' have failed to meet that standard.

However, as described above, the pleading requirements applicable to a Securities

Act claim are normally different from the heightened pleading requirements

applicable to a claim for securities fraud under the Exchange Act. The Court now

turns to examine whether Plaintiffs' allegations against the Underwriter

Defendants and Director Defendants "sound in fraud," which would trigger

application of the Rule 9(b) particularity requirement.

Plaintiffs contend that, as to the Underwriters and Directors, they must only

meet the standard imposed by Rule 8, as their claims against them sound in strict

liability or negligence. The Director Defendants and Underwriter Defendants, on

the other hand, argue that the claims brought against them, like the Securities Act

claims against the Individual Defendants, "sound in fraud" because the

33

misstatements upon which the claims are based are alleged to have been issued fraudulently by the Individual Defendants and therefore their claims are inextricably intertwined with fraud allegations.

In <u>Wagner v. First Horizon Pharmaceutical Corp.</u>, 464 F.3d 1273 (11th Cir. 2006), the Eleventh Circuit held that certain circumstances require that a claim brought under Section 11 of the Securities Act be pled with particularity—namely, "when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint." <u>Id.</u> at 1278. The court reasoned that the reputational interests protected by Rule 9(b) require that, even in the context of a Securities Act claim, any misrepresentation otherwise alleged as fraudulent be pled with particularity. The court explained:

> We conclude that a § 11 or § 12(a)(2) claim must be pled with particularity when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint. It is not enough to claim that alternative pleading saves the nonfraud claims from making an allegation of fraud because the risk to a defendant's reputation is not protected. It would strain credulity to claim that Rule 9(b) should not apply in this allegation: The defendant is a no good defrauder, but, even if he is not, the plaintiff can still recover based on the simple untruth of the otherwise fraudulent statement. Nor is it enough to present a general disclaimer in an attempt to immunize the nonfraud claims from the Rule 9 requirements, for the same common sense reasons. The purpose of the rule is to protect a defendant's good will and reputation when that defendant's conduct is alleged to have been fraudulent.

This conclusion does not add new elements to the nonfraud claims, nor does it elevate the pleading standard when the claim is not alleged to have been part of another fraud-based claim. If plaintiffs bring a § 11 or § 12(a)(2) claim without alleging the misrepresentation at issue in the claim was fraudulent, they would avoid the heightened pleading requirements of Rule 9(b). On the other hand, if the plaintiffs are claiming that the § 11 or § 12(a)(2) misrepresentation is part and parcel of a larger fraud, then the rule's

protective purpose attaches, and plaintiffs must plead with particularity.

Id. at 1278 (citations omitted).

Plaintiffs dispute that their primary-violation claims against the Underwriter Defendants and Director Defendants, which are only brought under the Securities Act, "sound in fraud," since they have not made any fraud allegations against these individuals elsewhere in the Complaint. The Underwriters and Directors, however, contend that the alleged misrepresentations against the Underwriters and Directors (contained in the IPO Registration Statement) are precisely the same allegations that are the source for Plaintiffs' Exchange Act claims against the Individual Defendants, and such intertwining requires that the Court apply the Rule 9(b) particularity requirement.

Addressing this question (which was left open in Wagner, 464 F.3d at 1277 n.2.) in its Order of August 5, 2008, this Court noted that as a general matter, it is

35

possible to plead a Section 11 claim against a defendant on the basis of misrepresentations made fraudulently by others, so long as ordinary negligence or strict liability is expressly pled and fraud has not been alleged elsewhere in the Complaint against that defendant.  However, the Court held that Plaintiffs must "exercise[] care in differentiating asserted negligence claims" from the asserted securities fraud claims to ensure that the reputational interests of the defendant charged with negligence are not infringed and the need for particularity is not present.  See In re Suprema Specialties, Inc. Secur. Litig., 438 F.3d 256, 272-74 (3d Cir. 2006).  After finding that Plaintiffs' Complaint did a "poor job" of distinguishing its fraud allegations against the Individual Defendants from its strict liability/negligence allegations against the Underwriter and Director Defendants (Order of Aug. 5, 2008, at 21-22), the Court ordered Plaintiffs to replead to comply with Wagner.

Having submitted their repleading, it appears that Plaintiffs have removed all references to the Underwriter Defendants and Director Defendants in paragraphs alleging fraud.  Moreover, Plaintiffs specifically assert in their Count alleging a Securities Act violation that their claims sound in negligence and/or strict liability.  (SAC ¶¶ 466, 470.)

AO 72A
(Rev.8/82)

Nevertheless, both the Director Defendants and Underwriter Defendants argue that Plaintiffs failed to comply with the Court's instruction to "exercise[] care in differentiating asserted negligence claims" because the SAC does not adequately separate the Section 11 allegations against the Director Defendants and Underwriter Defendants from the fraud allegations against the Individual Defendants. Indeed, there is not a single individualized allegation against the Director Defendants in the Complaint, and every reference to the Director Defendants in the Complaint is commingled with a reference to other Defendants who are charged with fraud elsewhere in the Complaint. (E.g., SAC ¶¶ 5, 14, 16, 19(a), 465, 467, 471.) And remarkably, despite the Court's prior observations, there still remains only *one* individualized allegation against the Underwriters, which asserts the Underwriters were obligated to make a reasonable and diligent investigation of statements in IPO Registration statement. There is no accompanying allegation that the Underwriters in fact failed to make such an investigation. (SAC ¶¶ 13, 177, 210, 470.) In view of this failing, it may well be

AO 72A
(Rev.8/82)

argued that Plaintiffs have failed to plead a Securities Act violation even under the more forgiving standard of Rule 8.[12]

The Director Defendants and Underwriter Defendants also argue that Plaintiffs' Securities Act count does not comply with <u>Wagner</u> because it is insufficiently linked to the 465-paragraph fact section that precedes its 7-paragraph count in the Complaint (Count 1). Despite the Eleventh Circuit's rejection of shotgun pleadings containing "incorporating" paragraphs and its disavowal of general "disclaimers" of fraud allegations, <u>Wagner</u>, 464 F.3d at 1278-80, Plaintiffs include precisely the same incorporation and disclaimer paragraph in their Securities Act count as this Court criticized in its prior Order, followed by a mere

_____

[12] In its Order of August 5, 2008, the Court left open the question of whether the Plaintiffs' sole allegation against the Underwriter Defendants was sufficient to meet the notice pleading standard of Rule 8:

> The Court also notes the Underwriters' contention that Plaintiffs' only specific allegation against the Underwriters does not even provide the level of notice required under Rule 8. . . . Because the Court grants leave to Plaintiffs to provide a more definite statement pursuant to Rule 12(e), the Court does not today address whether Plaintiffs' sole individualized allegation against the Underwriter Defendants meets the strictures of Rule 8.

(Order of Aug. 5, 2008 at 23 n.11.)

AO 72A
(Rev.8/82)

five paragraphs of conclusory allegations concerning the elements of a Securities Act violation. (SAC ¶¶ 467, 468-72.) Like the deficient pleading in <u>Wagner</u>, "[n]o further reference is made to the previous allegations in the complaint. . . ." <u>Id.</u> at 1279.

After reviewing Plaintiffs' Complaint, the Court agrees with Defendants that Plaintiffs' allegations against the Underwriter and Director Defendants are inextricably intertwined with their allegations against the Individual Defendants and, as a result, they "sound in fraud." Unlike the complaint in <u>In re Suprema Specialties</u>, in which the plaintiffs fully segregated their Securities Act allegations from their fraud allegations, placed their Securities Act allegations at the beginning of the Complaint, and did not incorporate any allegations alleging fraud into their Securities Act count, Plaintiffs here make little effort to distinguish their substantive allegations against the Underwriter and Director Defendants from their fraud allegations against the Individual Defendants, Plaintiffs' Complaint does not segregate their Securities Act allegations from the fraud allegations; it fails to link their Securities Act count to any particular allegations in the Complaint; and incorporates hundreds of pages of mostly fraud allegations before employing the disfavored disclaimer. Instead of offering a carefully pled series of allegations

against the Underwriter and Director Defendants separate and apart from the allegations of widespread fraud against the Individuals, Plaintiffs offer a shotgun pleading with a Securities Act claim that leaves the reader to sort out the mess. Plaintiffs are not helped by the fact that *every single* allegation of misstatements endorsed by the Underwriter and Director Defendants is likewise alleged as fraudulent against the Individual Defendants. Because Plaintiffs' allegations are "indisputably immersed in unparticularized allegations of fraud," Calif. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 160 (3d Cir. 2004), and because virtually all "facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim," Wagner, 464 F.3d at 1278, they must be treated in kind.

Having concluded that Plaintiffs' claims against the Underwriter and Director Defendants sound in fraud, the Court must proceed to examine whether (i) the allegations in this case are sufficiently particularized under Rule 9(b) to allege a Securities Act violation; (ii) the allegations in this case are sufficiently particularized under Rule 9(b) and the PSLRA to allege an Exchange Act violation; and (iii) the allegations are sufficient to meet the requirement of "scienter" to allege an Exchange Act violation. For the reasons discussed below,

Plaintiffs have failed to allege with sufficient particularity their Market Manipulation, WPD, and Accounting claims against the Individual Defendants, Underwriter Defendants and Director Defendants, and therefore no primary violation has been adequately alleged in this action.[13]

## V. Previously Dismissed Claims and Additional Allegations in the SAC

Before turning to examine Defendants' challenge of Plaintiffs' Complaint, the Individual Defendants seek clarification concerning whether Plaintiffs have successfully attempted to revive in the SAC their previously dismissed WPD and Accounting Restatement claims against Defendants Fuller, Hill, and Pershing. By an Order dated July 14, 2003, this Court dismissed Plaintiffs' Exchange Act WPD and Accounting Restatement claims for inadequate allegations of scienter. (See Order of Jul. 14, 2003 [81], at 41.) Plaintiffs have not moved for reconsideration of the Court's prior dismissal of these claims and the Court has not granted leave

---

[13] Even if the Court did not find that Plaintiffs' allegations against the Underwriter and Director Defendants sounded in fraud, the Court would nonetheless dismiss those claims because they fail even under the less rigorous pleading standard applicable to non-fraud Securities Act claims. As is discussed in more detail below, Plaintiffs must, at the very least, allege the reason the omissions from the IPO Registration Statement are misleading and allege facts existing at the time the IPO Registration Statement was issued that caused the statements alleged to be misleading. Besides failing the particularity requirement of Rule 9(b), neither Plaintiffs' Market Manipulation, WPD Impairment, or Accounting Restatement claims meet that standard.

AO 72A
(Rev.8/82)

to Plaintiffs to reassert these claims. Failure to do so renders those claims a "nullity" in the repleaded Complaint. See Hoover v. Blue Cross and Blue Shield of Ala., 855 F.2d 1538, 1544 (11th Cir. 1988) (failure to seek leave to reassert previously dismissed claims renders claims a "nullity"); Smith v. Duff and Phelps, Inc., 5 F.3d 488, 494 (11th Cir. 1993) (same).

Accordingly, to the extent that Plaintiffs attempt to revive their WPD and Accounting Restatement claims under Section 10(b) of the Exchange Act against Defendants Fuller, Hill, and Pershing, those claims are hereby **DISMISSED**.

Plaintiffs also attempt in their SAC to allege new allegations in this action, premised on alleged misrepresentations and omissions not included within their original or First Amended Complaint. For example, Plaintiffs allege for the first time in this seven-year-old action that Defendants fraudulently omitted to disclose that Mirant had become "overleveraged" due to overpayments for various company assets, and fraudulently omitted to disclose that its accounting control software was deficient and was not being updated or replaced properly. Plaintiffs have not sought leave from this Court to add additional claims in this action and have not demonstrated good cause for waiting to add those allegations until this stage in the litigation. See Fed. R. Civ. P. 16; Oravec v. Sunny Isles Luxury

Ventures, L.C., 527 F.3d 1218, 1231-32 (11th Cir. 2008). Furthermore, had the Plaintiffs requested leave, it is doubtful that the Court would have granted it in view of the prejudice Defendants would suffer as a result of the belated addition of those claims.

It is true that the Court granted leave to Plaintiffs to correct certain deficiencies in their Complaint and to amend their present allegations, but the Court did not authorize Plaintiffs to expand this action to include additional claims premised on misrepresentations not included within their prior Complaint. (See Order of Aug. 5, 2008.) Accordingly, insofar as Defendants move to dismiss Plaintiffs' claims premised on "overleveraging" and the failures of their accounting software system, their Motions are **GRANTED**.

## VI. Market Manipulation Claims

As it relates to Plaintiffs' Market Manipulation claims, Defendants contend that Plaintiffs have failed to plead an actionable claim under the Securities Act and Exchange Act because Plaintiffs have inadequately alleged that any statements or omissions included in Plaintiffs' financial statements issued within the Class Period were false or misleading. Moreover, the Individual Defendants contend that their statements in various press releases relating to pending investigations into

pricing in California were not misleading because Plaintiffs have failed to allege that Mirant violated any laws for which disclosure was necessary. The Court agrees that Plaintiffs have failed to state a claim and dismisses Plaintiffs' Market Manipulation claims.

As stated above, a complaint alleging a violation of the Securities Act must plead an untrue statement of a material fact or an omission to state a material fact necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a). "To avoid dismissal of a section 11 omission claim, plaintiffs must properly allege: 1) the prospectus contained an omission; 2) the omission was material; 3) defendants were under a duty to disclose the omitted material information; and 4) that such information existed at the time the prospectus became effective." Oxford Asset Mgmt, 297 F.3d at 1189.

A complaint alleging securities fraud must provide even more detail, as it must "specify each statement alleged to have been misleading, *the reason or reasons why the statement is misleading*, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B) (emphasis added). "A sufficient level of factual support for a

44

[securities fraud] claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks omitted).

In cases alleging securities fraud based on the failure to disclose the existence of an underlying illegal scheme, the basis for the illegality must be pled with particularity. See In re Axis Capital Holdings Ltd. Securities Litig., 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006). Indeed, "[i]f the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed." Id. (citing In re Yukos Oil Co. Secs. Litig., 2006 WL 800736, at *12 (S.D.N.Y. Mar. 30, 2006)) (emphasis in original). In In re Axis Capital, the court dismissed allegations that an insurance company had committed securities fraud by failing to disclose the existence of a purportedly illegal anticompetitive kickback scheme because the complaint failed to allege how the purported scheme violated state or federal law. Id. at 585-86.

In moving to dismiss, Defendants challenge the central premise upon which Plaintiffs' Market Manipulation claims are based—that Mirant's California energy

45

activities were illegal and Defendants had a duty to disclose the "true nature" of those activities and their illegality. Defendants contend that Plaintiffs have failed to allege how the varied trading practices alleged in the Complaint were illegal and how the Individual Defendants knew that these activities inevitably would be investigated, litigated, and remedied at a substantial future cost to Mirant, triggering a duty to disclose. Moreover, Defendants contend that Plaintiffs' allegations fail in light of their actual disclosures concerning the investigations in California. For example, in their IPO Registration Statement filed in August of 2000, Mirant disclosed that an investigation was ongoing concerning its activities in California and that it did not know what the outcome of the investigation would be.

The IPO Registration Statement stated as follows:

[T[he FERC established October 30, 2000, as a "refund effective date" under section 206 of the Federal Apower Act, after which date the FERC may adjust prices retroactively based on the results of the investigation if it determines that existing rates are not just and reasonable. As a result, any price adjustment by the FERC may require the SE California subsidiaries to refund some portion of the revenues received from sales made after the refund effective date. The FERC's investigation is ongoing, and it cannot be determined at this time what conclusions the report will reach, what action the FERC may take in response to the report or whethe the FERC will order the payment of refunds. Consequently, we cannot determine what effect any action by FERC will have on our financial condition.

46

IPO Registration Statement at 186.

The principal allegation of Plaintiffs' California Market Manipulation claim is that a number of unidentified Mirant traders employed "Enron-style" energy trading schemes to artificially increase energy prices and reap purportedly illegal profits in a mostly unregulated California energy market. Given the complexity and numerosity of these allegations, it is helpful to note what has not been alleged. First, Plaintiffs do not allege that the Individual Plaintiffs initiated, directed, or participated in the improper trading activities. Rather, the allegations in the Complaint focus solely on the activities of lower-level employees of Mirant. These improper trading activities were, according to Plaintiffs, "widespread" within Mirant, but it is not clear how many Mirant traders were involved in the alleged activities. Of approximately 500 traders on Mirant's Atlanta trading floor, Plaintiffs allege between 40 and 50 worked primarily on California energy trades. (SAC ¶ 106.)

Second, Plaintiffs do not allege that any specific financial data affirmatively reported by Mirant in its IPO Registration Statement or any of its financial disclosures during the Class Period concerning its California operations was

inaccurate or misleading.[14] Rather, their securities fraud theory is based principally on what the Mirant Individual Defendants (and the Director Defendants and Underwriter Defendants for purposes of the Securities Act claim) omitted to tell investors about the effect on *future* revenues and liabilities of current allegedly improper trading behavior. In this vein, Plaintiffs contend that the Individual Defendants knew that Mirant employees were engaging in these trading practices and knew that they were illegal, yet failed to disclose the nature of the practices to investors and to reserve for the future liability that would arise as a result of their public revelation.[15] (SAC ¶¶ 203, 480-90.) But Plaintiffs provide no further insight into (i) what about the alleged trading activities rendered them illegal, *i.e.*,

---

[14] Plaintiffs do allege that Mirant was systemically deficient in its accounting practices, but they do not particularize how those accounting deficiencies led to inaccurate reporting of its revenues or profits in the California energy market.

[15] Specifically, Plaintiffs allege that Mirant and the Individual Defendants (i) failed to reserve for the return of illegally obtained revenue and the professional fees that would accrue as a consequence of the investigation and prosecution of Mirant's illegal conduct; (ii) failed to disclose that their profits enjoyed in the summers of 2000 and 2001 were not sustainable because they were illegal and would eventually dry up; (iii) fraudulently stated, in responding to early allegations of impropriety, that Mirant "operated appropriately, and complied in full, with the rules of the western power market" (SAC ¶ 298); and (iv) fraudulently denied that Mirant did not engage in "simultaneous buy and sell trades with counterparties for the purpose of inflating its trading volumes or revenues." (SAC ¶ 291; see also SAC ¶¶ 218, 224, 229, 238, 241, 248, 250, 257, 261, 263, 267, 278,-79, 284, 290, 296, 307.)

what laws were violated; and/or (iii) upon what basis the individual Defendants should have known that the transactions were illegal and subject to civil forfeiture.

To be sure, there is no shortage in the Complaint of descriptions of nefarious sounding energy trades that raise a specter of impropriety. "Ricochet games," artificial congestion, "inc-ing," and "loop-to-looping" are not the stuff of an honest trade. But with the Complaint's abundance of adjectives and labels, it lacks an explanation and legal basis. The blanket characterization of business transactions as illegal does not make them so, nor does alleging their non-disclosure necessarily state a valid Securities Act or Exchange Act violation. To do so, Plaintiffs must allege with particularity the *reason* why Defendants' were under a duty to disclose a particular transaction. In re Axis Capital, 456 F. Supp. 2d at 585; Oxford Asset Mgmt, 297 F.3d at 1189. In this case, Plaintiffs contend in conclusive fashion that the reason is because Defendants' underlying business activity was illegal, but provide no explanation of its theory of illegality, much less how Defendants were aware of its illegality at the time of the purportedly misleading disclosures and omissions. Quite simply, the Complaint fails on both counts: It does not describe how any of the purportedly improper trading practices violated state or federal law

and it does not describe how the Individual Defendants' purported knowledge of those activities triggered a duty to disclose them to investors.

For example, Plaintiffs conclusively allege that, as a part of Defendants' scheme to manipulate the price of energy in California, employees of Mirant wrongfully shut down functional power plants to restrict supply and increase the price of energy. (SAC ¶¶ 37, 70, 72-74, 94-97.)  However, Plaintiffs' Complaint provides no legal basis to support the premise that Mirant violated state or federal law by unilaterally declining to produce or sell power at the full capacity of its production facilities.  Plaintiffs do not allege, for example, that Mirant conspired with competing energy producers to fix the price or manipulate the supply of energy in violation of federal or state antitrust laws.  Contra In re Sotheby's Holdings, Inc. Sec. Litig., No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. 2000) (finding that plaintiffs adequately alleged securities fraud premised on failure to disclose illegal price-fixing agreements that allegedly violated federal antitrust laws).

Even Plaintiffs' responsive briefing fails to articulate a clear theory of illegality underlying their claims of purported market manipulation.  Responding to Defendants' arguments in this regard, Plaintiffs' argument boils down to the

50

following: "[T]he Individual Defendants' statements about the reasons for Mirant's successes in California were misleading because they omitted the fact that Mirant engaged in activities designed to *artificially affect the apparent relationship between supply and demand* in the energy market in order to achieve [] successes." (Op. Br. at 32-33 (emphasis added).) Such a conclusory and generalized allegation provides no detail how Mirant operated illegally and how the Individual Defendants were under an obligation under the Securities Act or Exchange Act to disclose the nature of the alleged activities.

In sum, Plaintiffs' allegations of artificial trading practices fail to include any cognizable theory of illegality, and their conclusive allegations concerning the Mirant Individual Defendants' failure to disclose those activities to investors do not state a claim under the securities laws.[16]   Moreover, the allegedly misleading

---

[16] For ease of reference, the Court has considered Plaintiffs' market manipulation claims under the Securities Act and the Exchange Act together in one section, and concludes that those claims fail to plead both a Securities Act violation and an Exchange Act violation.  As described above, the pleading requirements for each claim are generally distinct, and Plaintiffs contend that they do not have to plead with particularity their Securities Act violations against the Underwriter Defendants and Director Defendants because those claims do not sound in fraud.  Although the Court concluded above that Plaintiffs' Securities Act claims against the Underwriter and Director Defendants sound in fraud, the Court would nevertheless dismiss Plaintiffs' Securities Act claims premised on asserted manipulation in the California energy market for the same reasons as discussed above, even if those claims did not sound in fraud.

AO 72A
(Rev.8/82)

press releases in which the Individual Defendants asserted compliance with the rules of the western power market are also insufficient to state a claim under the Exchange Act because Plaintiffs have likewise failed to identify which rules of the western power market were violated and why the Individual Defendants had a duty under the Exchange Act to disclose those rule violations.

--------

In <u>Oxford Asset Management, Ltd. v. Jaharis</u>, the Eleventh Circuit held that, where a plaintiff relies on an omission in a registration statement, the plaintiff must demonstrate the legal basis for concluding that the defendant had a duty to disclose the alleged omission. 297 F.3d at 1190. It explained:

> Section 11(a) only makes actionable the omission of a material fact required to be stated in the prospectus or necessary to make the statements in the prospectus not misleading. To hold that section 11(a) imposes liability unless the prospectus includes all material facts is simply to wholly ignore and render superfluous that section's qualifying language "required to be stated therein or necessary to make the statements therein not misleading." This we may not do. . . . We join with the First Circuit in recognizing that the "mere possession of material nonpublic information does not create a duty to disclose it" and that the duty question is properly stated as "whether the defendants had a specific obligation to disclose information of the type that the plaintiffs complain was omitted from the registration statement and prospectus." <u>Shaw v. Digital Equipment Corp.</u>, 82 F.3d 1194, 1202 (1st Cir. 1996).

<u>Id.</u>

For the reasons explained above, Plaintiffs have failed to demonstrate that Defendants had a specific obligation to disclose the "true nature" of Mirant's California operations because Plaintiffs do not provide any detail in their Complaint or in their briefing as to why the alleged trading practices were illegal, much less why the signatories of the IPO Registration Statement had a duty to disclose the nature of those practices.

AO 72A
(Rev.8/82)

Accordingly, insofar as the Individual Defendants', Underwriter Defendants, and Director Defendants move to dismiss Plaintiffs' claims under the Securities Act and Exchange Act premised on their allegations of market manipulation, their Motion is **GRANTED**.[17]

## VII.  WPD Impairment Claims

Defendant Ward and the Securities Act Defendants move to dismiss Plaintiffs' allegations concerning Mirant's failure to writedown its WPD asset.  As described in detail above, Plaintiffs allege as a part of both their Securities Act and Exchange Act claims that Defendant Ward failed to record a $36 million impairment of Mirant's WPD asset beginning in the fourth quarter of 1999, as did its PPL counterpart.  Plaintiffs also allege, as a part of only their Exchange Act claims, that Defendant Ward fraudulently failed to record a $117 million impairment of WPD beginning in 2001 and fraudulently understated its value in 2002 when it estimated its value at $290 million, $55 million below the amount for which the asset eventually sold a month later.

---

[17] Having concluded that Plaintiffs' California Market Manipulation Claims do not state a claim of securities fraud, the Court does not reach the Individual Defendants' alternative arguments that Plaintiffs' have inadequately alleged scienter and loss causation.

AO 72A
(Rev.8/82)

Defendants move to dismiss these allegations, arguing that they do not state a Securities Act violation, are not sufficiently particularized, and do not adequately allege scienter to state an Exchange Act violation.  Defendants contend that the Complaint does not reveal any basis to conclude that his decision not to impair the WPD asset was fraudulent as opposed to a bad business decision, and Plaintiffs' reliance on hindsight and the decision of its business partner alone is insufficient. Plaintiffs respond that the allegations are sufficient because they allege that no impairment testing was conducted as required by FAS 121 (now FAS 144) despite the announcement of a regulatory rate change in the U.K. that materially reduced WPD's profit potential.  Plaintiffs also contend that they have adequately pleaded scienter by reason of Defendant Ward's position within Mirant (SAC ¶¶ 370-71, 376), his responsibility, oversight of, and participation in accounting activities, and his receipt of a memorandum providing an "ad hoc" explanation of why an impairment of WPD was not taken in the fourth quarter of 2001.  (SAC ¶ 384-399.)

A.    <u>WPD Securities Act Claim Against the Individual Defendants, Director Defendants, and Underwriter Defendants</u>

As stated, Plaintiffs premise both their Securities Act and Exchange Act claims on the allegation that Mirant should have written down WPD in its financial

54

statements released after the fourth quarter of 1999, prior to the time it filed its IPO Registration Statement.  The Court begins by examining whether Plaintiffs have alleged a valid claim under the Securities Act.

In order to sustain a claim under the Securities Act, Plaintiffs "must plead facts establishing that the [IPO Registration Statement] contained a material misrepresentation or omission on the date it was issued."  Rudd v. Suburban Lodges of Am., Inc., 67 F. Supp. 2d 1366, 1370 (N.D. Ga. 1999) (citations omitted).  In other words, Plaintiffs must allege that the facts that rendered a misstatement or omission misleading existed at the time the IPO Registration Statement became effective.  Allegations of fraud by hindsight are insufficient to sustain a Securities Act claim.  TAAM Assocs., Inc. v. Housecall Med. Res., Inc., 1998 WL 1745361, at *5 (N.D. Ga. Mar. 30, 1998) (citing 15 U.S.C. §§ 77k and 77l).

In this case, Plaintiffs allege that no impairment test was conducted in the fourth quarter of 1999 despite the announcement of a regulatory rate change that reduced the price WPD would be paid in the United Kingdom for energy by approximately 20%.  But besides conclusively asserting that impairment was required under then-FAS 121 and noting that Mirant's counterpart, PPL, took an

impairment, Plaintiffs do not allege how an impairment test should have been conducted and why the results of such an impairment test would have necessarily required Mirant to recognize an impairment. Moreover, besides describing the results of its joint venture partner's own publicly reported impairment testing, Plaintiffs do not allege any other information existing at the time the reports were issued that leads to the conclusion that Mirant's valuation of WPD was misleading in light of the analysis required by FAS 121.

Indeed, although PPL decided to take an impairment of $36 million in the fourth quarter of 1999, Plaintiffs admit based upon undisputed documents before the Court that, at that time, PPL was governed by a different set of accounting rules than Mirant. PPL evaluated its investment under APB Opinion No. 18, which requires that a company take a write-down if "fair value"—based upon a calculation of discounted cash flows—is less than "carrying value" and the reduction in fair value is not "temporary." The test under then-FAS 121, however, is much different. "[I]n the initial determination of whether to write-down an asset, the book value of the asset is not considered against its present fair value [based on a calculation of *discounted* cash flows], but rather against a potentially much greater sum—the total *undiscounted* value of future cash flows . . ."

Amalgamated Bank v. Coca-Cola Co., No Civ. A. 1:05-CV-1226, 2006 WL 2818973, at *14 (N.D. Ga. Sept. 29, 2006) (emphasis added). Therefore, Plaintiffs' reliance on the decision of PPL to take a writedown under APB Opinion No. 18 says little of whether Mirant's failure to impair WPD by $36 million (less than 10% of its reported value of $561 million and based upon a calculation of undiscounted future cash flows) was a misstatement of present fact.

Accordingly, Plaintiffs' allegations concerning Mirant's failure to recognize an impairment of its WPD asset in the fourth quarter of 1999 do not state a Securities Act violation. Plaintiffs' Complaint, though it alleges that Mirant did not conduct an impairment test, does not allege facts establishing that FAS 121 required Mirant to recognize an impairment of $36 million. Therefore, it fails to allege facts that would render its IPO Registration Statement misleading. Accordingly, insofar as the Individual Defendants, Director Defendants, and Underwriter Defendants move to dismiss Plaintiffs' Securities Act claim premised on its allegations of failure to write down the value of Mirant's interest in WPD, their Motions are **GRANTED.**

AO 72A
(Rev.8/82)

B.    WPD Exchange Act Claims Against Defendant Ward

Defendant Ward also moves to dismiss Plaintiffs' Exchange Act claims, which, as stated, are premised on allegations that Defendant Ward failed to record the $36 million impairment of Mirant's WPD asset beginning in the fourth quarter of 1999, as did PPL; failed to record a $117 million impairment of WPD beginning in 2001, as did PPL, and fraudulently understated the value of Mirant's interest in PPL in 2002, by estimating it at $290 million, $55 million higher than it sold for a month later.

Because GAAP provides accountants with a wide range of discretion, GAAP violations must be pled with particularity.  See Lovelance v. Software Spectrum Inc., 78 F.3d 1015, 1021 (5th Cir. 1996) (noting that GAAP "is a term of art encompassing a wide range of acceptable procedures, such that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement" (citations and quotations omitted)).  Accordingly, plaintiffs must plead "pertinent facts, including particular transactions as well as the underlying basis for any figures asserted by Plaintiffs, demonstrating that the specified accounting principle applies."  K-Tel Int'l, Inc. Sec. Litig., 107 F. Supp. 2d 994, 999-1000 (D. Minn.

2000).  Bald allegations that "statements in one report should have been made in earlier reports do not make out a claim of securities fraud."  Id. (citing Stevelman v. Alias Research, 174 F.3d 79, 94 (2d Cir. 1999)).

In In re Serological Securities Litigation, No. Civ. A. 1:00-CV-1025-CAP, 2003 WL 24033694 (N.D. Ga. Feb. 20, 2003), and Amalgamated Bank v. Coca-Cola Co., No Civ. A. 1:05-CV-1226, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006), aff'd Selbst v. Coca-Cola Co., No. 07-11738 (11th Cir. Jan. 10, 2008), this Court examined the requirement of particularity in the context of a securities fraud claim based upon similar allegations.  Both cases held that, in order to sustain a claim for securities fraud based upon an alleged failure to write down an asset, the Complaint must go further than merely alleging with the benefit of hindsight that an impairment should have been taken to reflect a decline in fair market value. Rather, the Complaint must provide detail as to why an impairment was required under then-existing accounting rules.  In re Serologicals, 2003 WL 24033694, at *10; Amalgamated Bank, 2006 WL 2818973, at *16.  Thus, in order to plead an adequately particularized claim, the Complaint must, for example, detail how the results of an impairment test were reported fraudulently in the company's financial

59

disclosures, or how impairment testing should have been conducted and how that testing would have necessarily required a recognition of an impairment.  Id.

As it relates to Plaintiffs' allegation against Defendant Ward that he violated the Exchange Act by failing to record an impairment to WPD in the fourth quarter of 1999, Plaintiffs' allegation suffers from the same infirmities as described above. Plaintiffs' Complaint, though it alleges that Mirant did not conduct an impairment test, does not allege facts establishing that FAS 121 required Mirant to recognize an impairment of $36 million.  Therefore, it fails to allege facts that would render Defendant Ward's decision not to recognize an impairment of WPD misleading.[18]

As it relates to Plaintiffs' allegation that Defendant Ward failed to recognize a $117 million impairment in the fourth quarter of 2001, Plaintiffs' claim suffers a similar fate.  Even though Plaintiffs assert that PPL and Mirant were governed by the same accounting rules in the fourth quarter of 2001—when Mirant declined

---

[18] Although Plaintiffs allege that this case is different that Amalgamated Bank and In re Serologicals because in this case Plaintiffs allege that no impairment test was conducted, Plaintiffs still must allege that the results of such an impairment test would have required Mirant to recognize an impairment.  That is, Plaintiffs must allege that Mirant's failure to conduct testing *caused* Mirant's financial statements to report a value of its interest in WPD that was not in compliance with FAS 121.  Even if Mirant violated FAS 121 by not conducting an impairment test, Mirant's failure to recognize an impairment in its 1999 financial statements would not be misleading if the results of that test would not have required recognition of an impairment anyway.

60

AO 72A
(Rev.8/82)

to take the $117 write down that PPL took in its financial statements—Plaintiffs'

own allegations undermine its blanket contention that Defendant Ward's decision

not to do so constituted securities fraud.  Plaintiffs allege that Mirant's Director of

Accounting Policy and Analysis, Dave Cathcart, gave consideration to whether to

write down WPD in the fourth quarter of 2001.  Cathcart filed the results of his

analysis in an internal Mirant memorandum provided to Defendant Ward, in which

Cathcart evaluated WPD's worth.  Though Plaintiffs label it an "ad hoc" analysis,

Catchart stated that PPL—which Plaintiffs rely on as accurately stating the

valuations of WPD—had in 2001 estimated the fair market value of WPD, as a

whole, to be between $400 million and $1 billion.  Thus, Plaintiffs allege, PPL

estimated Mirant's share of 49% between approximately $200 and 500 million.

Based on this estimate, Cathcart stated that Mirant's current estimate of its share

of WPD at $425 million was within PPL's range of estimates, and therefore

impairment was not required.  (SAC ¶¶ 134-38.)

Although Plaintiffs conclusively allege that Catchart's analysis was flawed

under APB Opinion No. 18, the pertinent accounting rule, Plaintiffs fail to identify

what was fraudulent about this analysis other than the fact that it reached a

different conclusion than PPL.   Moreover, Plaintiffs fail to identify how

Defendants' reliance on Cathcart's analysis amounted to securities fraud. Taking Plaintiffs' allegations as true, the Court concludes that Plaintiffs' allegation concerning Defendant Ward's failure to write down WPD in the fourth quarter of 2002 does not state a valid and particularized claim of securities fraud under Rule 9(b) or the PSLRA.

Finally, although Plaintiffs allege that Defendant Ward's valuation of WPD in July 2002 was fraudulent, Plaintiffs assert no basis for this allegation other than the fact that an offer was made to Mirant for WPD prior to its sale in October. Mirant allegedly rejected the offer, which—rather than supporting an assertion that the asset was less valuable than reported—is an action consistent with a belief that the asset has a higher value than the amount offered. Moreover, Plaintiff's reliance on facts gleaned in hindsight, such as the sale of WPD in October of 2002 for approximately $50 million less than it had evaluated, is not alone enough to state a claim of securities fraud.

In short, the Court agrees that Plaintiffs' claims fall far short of the particularity required to sustain a failure-to-impair claim. As in <u>Amalgamated Bank</u>, Plaintiffs fail to allege how performing an adequate impairment test would have resulted in a writedown of the WPD asset. Plaintiffs' reliance on facts

gleaned in hindsight and the activities of another company does not provide a sufficient basis to conclude that Defendant's decision not to impair the WPD asset was fraudulent as opposed to a bad, but discretionary, business decision.

Alternatively, the Court concludes that Plaintiffs have not set forth facts sufficient to lead a reasonable person to draw a cogent and compelling inference that Defendant Ward intended to defraud or was so severely reckless that he must have been aware of the misleading nature of Mirant's evaluation of WPD. 15 U.S.C. § 78u-4(b)(2); Tellabs, 127 S.Ct. at 2504-05. Although Plaintiffs' motive, opportunity, and participation allegations (SAC ¶¶ 370, 371, 376, 379, 384-99) unquestionably lead to the inference that Defendant Ward participated in the decision not to write down the value of WPD, those allegations would not lead a reasonable person to deem the inference of scienter at least as strong as the opposing inference that Defendant Ward reported the value of WPD within accounting discretion, using a "wide range of acceptable procedures, such that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures . . . ." See Lovelance, 78 F.3d at 1021.

AO 72A
(Rev.8/82)

Accordingly, insofar as Defendant Ward moves to dismiss Plaintiffs' Securities Act and Exchange Act claims premised on an allegation of failure to impair Mirant's WPD asset, his Motion is **GRANTED**.

## VIII. Accounting Restatement Claims

The Individual Defendants, Underwriter Defendants, and Director Defendants also move to dismiss the Accounting Restatement Claims, asserting that they are not pled with the requisite particularity or scienter.

As described above, Plaintiffs allege that Mirant reviewed "several accounting issues" on July 30, 2002, and restated its financial statements for the year-end 2000, 2001, and the first quarter of 2002. (SAC ¶¶ 8; 150-53 304-24.) The restatements included a $85 million overstatement of a gas inventory asset and a "potential" $68 million overstatement of an accounts receivable asset. On November 7, 2002, Mirant filed an amended 10-Q for the first quarter of 2002, restating its financial results for 2001 and 2002 and reducing retained earnings by approximately $51 million and adjusting its December 30, 2000 and 2001 balance sheets by reducing both energy marketing and risk management assets and liabilities by $1.53 million and $820 million, respectively, to eliminate intra-company transactions. (SAC ¶ 151.) Ultimately, on April 30, 2003, Mirant

announced that it had restated net income for 2000 by $29 million and in 2001 by $159 million.

A. Accounting Restatement Securities Act Claim Against the Individual Defendants, Director Defendants, and Underwriter Defendants

The Securities Act Defendants first point out that the restatements for years 2001 and the first quarter of 2002 are irrelevant to the Securities Act claim because the September 26, 2000 IPO Registration Statement only contained audited financial statements for 1997, 1998, and 1999 and unaudited financial information for the first six months of 2000. They argue that the restatements cannot be the source of a claim under the Securities Act because the net effect of the restatement was positive. Moreover, Defendants contend that Plaintiffs' allegation that a $29 million adjustment was made to year-end 2000 income cannot underlay their Securities Act claim because Plaintiffs do not allege facts that tie this adjustment to any financial transaction occurring in the first six months of 2000, which is the only time period reported in the IPO Registration Statement. The restatements cited by Plaintiffs are adjustments in 2002 to Mirant's audited, year-end 2000 and 2001 financial statements, which were not contained in the September 26, 2000 IPO Registration Statement. Moreover, because Plaintiffs do not allege how these alleged misstatements materially

65

affected the price of Mirant's shares issued pursuant to the Registration Statement, Defendants contend they are entitled to dismissal.

Plaintiffs respond by contending that it is improper to consider offsets between different line items because GAAP accounting "does not provide for the netting or even comparison of two unrelated items," and the fact that Mirant restated these items in and of itself means that each item was material. (Opp. at 57.) Moreover, Plaintiffs contend that even though the 2000 year-end restatement does not specify whether it pertains to any transactions in the first 6 months, an allegation that operating revenue for the year 2000 was restated as a result of Mirant's overstatement of natural gas inventories affecting 2000 and "prior years" is sufficient to state a claim that the numbers relied upon in the IPO Registration Statement were misleading.

Having reviewed Plaintiffs' allegations, the Court concludes that Plaintiffs fail to state a Securities Act violation. The Plaintiffs' bare allegation that the restatement of $29 million less of income for the year-end 2000 financial statements is not a sufficient basis to conclude that 6 months of unaudited financial data in Mirant's IPO Registration Statement was materially false. Plaintiffs' allege that Mirant reported a $1.40 billion profit (SAC ¶ 34) at the year-end of 2000.

AO 72A
(Rev.8/82)

Plaintiffs may not plead a Securities Act violation based on the inference that at least some of the $29 million of restated income was reported in Mirant's IPO Registration Statement. Rather, an essential element of Plaintiffs' Securities Act claim is missing: identifying a specific false statement fact that was reported in the financial statements contained in Mirant's IPO Registration Statement.

In sum, Plaintiffs fail to allege facts establishing that facts reported in Mirant's IPO Registration Statement were materially false, much less particularize those facts in compliance with Rule 9(b). Accordingly, insofar as the Individual Defendants, Underwriter Defendants, and Director Defendants move to dismiss Plaintiffs' Securities Act Accounting Restatement claims, their Motions are **GRANTED**.

> B. <u>Accounting Restatement Exchange Act Claim Against Defendant Ward</u>

Defendant Ward also moves to dismiss Plaintiffs' Exchange Act claims premised on the accounting restatement announced in 2002. In support of dismissal, Defendant Ward contends that Plaintiffs have failed to adequately allege scienter as required by the PSLRA. The Court agrees.

In addition to the restatement described above, Plaintiffs cite the testimony of a confidential informant, who "reported to" Defendant Ward. The informant

stated that Mirant overstated revenues in its "PowerBooks," which the employee reported to his supervisors. Rather than correct the errors, Plaintiffs claim, "the employee 'was instructed to roll it over to the next month and not to worry about it.'" (SAC ¶¶ 159-70.) Plaintiffs also allege that failure to disclose to investors the lack of internal accounting controls amounted to securities fraud, and Defendant Ward was aware of those accounting control deficiencies. (SAC ¶¶ 150-71.) Specifically, Plaintiffs allege that material weaknesses in Mirant's accounting controls included (i) inadequate analysis, documentation and internal communication of natural gas actualization adjustments; (ii) inadequate reconciliation of Mirant's risk report and general ledger; (iii) inadequate systems integration and data reconciliation; and (iv) untimely resolution of balance sheet account reconciliation discrepancies. (SAC ¶ 153.) Plaintiffs contend that the magnitude of the accounting fraud; the statements of confidential witness; the position of Defendant Ward; and his awareness of Mirant's internal control weaknesses combine to yield a strong inference that Defendant Ward acted with an intent to defraud or severe recklessness.

After full review of Plaintiffs' allegations, the Court concludes Plaintiffs have failed to state with particularity facts giving rise to a strong inference that

Defendant Ward acted with the required state of mind. <u>See</u> 15 U.S.C. § 78u-4(b)(2). As an initial matter, the fact that the restatement, along with reducing income to account for the overvalued natural gas asset, also adjusted for a significant amount of understated revenue during the Class Period tends to mitigate the inference that Defendant Ward was acting with the intent to defraud investors. It would also make little sense, if Defendant Ward intended to defraud, to understate Mirant's earnings in the first quarter of 2002, as the restatement concluded.

Second, although the confidential informant's testimony reveals apparently inappropriate behavior, it neither directly implicates the knowledge or actions of Defendant Ward nor relates directly to the accounting fraud which is alleged against him. <u>See</u> <u>Mizzaro</u>, 544 F.3d at 1240 (noting that impact of confidential informant's testimony is less where confidential witness does not have knowledge of fraud alleged and testimony is not proximate to the offending conduct). Indeed, citing a "laundry list" of alleged improper acts, "which lack any specific ties to the alleged fraud at issue, do not get plaintiffs far in creating a strong inference of scienter." <u>Ezra Charitable Trust v. Tyco Int'l, Ltd.</u>, 466 F.3d 1, 13 (1st Cir. 2006).

AO 72A
(Rev.8/82)

Finally, Plaintiff's allegations concerning the deficiency in Mirant's internal controls do not lead to a strong inference of scienter. Although Plaintiffs rely on a series of audits performed during and after the Class Period which observed the need for improvements in Mirant's accounting, many of the internal memoranda on which Plaintiffs rely in support of their scienter allegations drew the opposite conclusion—namely, that there was "no significant process deficiency that would jeopardize accurate and timely filings to the SEC," James Jacobson, SEI Corporate Audit Third Quarter Report (Sept. 29, 2000) (Ex. H to Def. Ward's Mot. to Dismiss),[19] or that "we did not identify any significant internal control problems or weaknesses which would be considered pervasive in their impact on the overall effectiveness and efficiency of operations, reliability of financial reporting, or Mirant's compliance with applicable laws and regulation." (SAC ¶ 412; Letter from Jim Jacobson, Director, Corp. Audi, to Mirant Corp. Audi Comm. (Feb. 11, 2002).) The fact that Defendant Ward was aware of deficiencies in Mirant's accounting system leads more to the inference of negligence and incompetence as

---

[19] "In ruling on a motion to dismiss, the court may consider evidence outside the pleadings so long as the plaintiff relies on it, and its authenticity has not been questioned." Skubella v. Checkfree Corp., No. 1:07-CV-796-TWT, 2008 WL 1902118, at *3 (N.D. Ga. Apr. 25, 2008) (citing Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999)).

70

opposed to scienter or extreme recklessness.  E.g., In re Ceridian Corp. Securities Litig., No. 07-2707, 2008 WL 4163782, at *6 (8th Cir. 2008) ("More compelling is the opposing inference that Ceridian and the controlling officer defendants *should have known* about the many accounting errors affecting many areas of the corporation.") (emphasis added); see also In re Westinghouse Sec. Litig., 832 F. Supp. 948, 979 (W.D. Pa. 1993) ("The fact that the internal auditors recommended improvements in valuation methods and tighter standards for internal valuations does not support plaintiffs' claim that . . . . [Defendants] fraudulently or even inaccurately represented its internal controls as adequate."); In re Loudeye Corp. Sec. Litig., No. C06-144 2MJP, 2007 WL 2404626 (W. D. Wash. 2007) ("Allegations that Defendants had deficient internal controls during the class period does not create a strong inference that Defendants knowingly ma[de] false or misleading statements.").  Nor are the accounting errors alleged so highly unreasonable that they constitute "an extreme departure from the standards of ordinary care. . . so obvious that the defendant must have been aware of it." McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989) (citations and quotations omitted).

AO 72A
(Rev.8/82)

Accordingly, insofar as Defendant Ward moves for summary judgment on Plaintiffs' Exchange Act claim premised on their Accounting Restatement allegations, his Motion is **GRANTED**.

## IX. The "Controlling Person" Claims

Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, "a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded." <u>Mizzaro</u>, 544 F.3d at 1237. Having failed to plead an adequate primary violation of either Section 11 of the Securities Act or Section 10 of the Exchange Act, Plaintiffs' "controlling person" claims are due to be dismissed. Therefore, insofar as the Individual Defendants and Southern Company move to dismiss Plaintiffs' controlling person claims, their Motions are hereby **GRANTED**.

## X. Dismissal With Prejudice

As a result of the Court's rulings in this Order, this case is dismissed. Although Plaintiffs do not request leave to amend their Complaint, the Court finds it appropriate to explain its decision to dismiss Plaintiffs' claims with prejudice. "A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion

to amend nor requested leave to amend before the district court." <u>Wagner v. Daewoo Heavy Industries Am. Crop.</u>, 314 F.3d 541, 542 (11th Cir. 2002). Moreover, "justice does not require district courts to waste their time on hopeless cases," and leave may be denied where the Court determines that amendment will be futile. <u>Mizzaro,</u> 544 F.3d at 1237.

This case has entered its eighth year, and Plaintiffs have had the opportunity to amend their complaints on two occasions. In its Order of August 5, 2008, the Court noted specific deficiencies in Plaintiffs' Complaint under <u>Wagner</u>. As the Court discussed above, Plaintiffs failed to cure those deficiencies. In view of the history of this action and the expansive amount of time Plaintiffs have had to correct deficiencies in their Complaint, the Court finds that it would be futile to allow Plaintiffs to proceed further. The Court also notes that allowing Plaintiffs to amend their Complaint would frustrate the purpose of the PSLRA by prolonging a non-meritorious securities fraud action. Accordingly, this case is dismissed with prejudice.

AO 72A
(Rev.8/82)

## XI.     Rule 11 Sanctions

The PSLRA expressly requires courts to make Rule 11 findings upon the final adjudication of a federal securities fraud action. The relevant provision states:

(1) Mandatory review by court

> In any private action arising under this subchapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

(2) Mandatory sanctions

> If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 77z-1 (1998); see also Ehlert, 245 F.3d at 1320 (reversing district court for failing to make necessary Rule 11 findings after dismissing complaint).

After having reviewed the extensive filings in this case, the Court finds that all parties and all attorneys have complied with the requirements of Rule 11(b) of the Federal Rules of Civil Procedure as to all complaints, responsive pleadings,

74

and dispositive motions filed in this case. Accordingly, no sanctions shall be imposed pursuant to Rule 11(b).

## Conclusion

For the reasons set out above, the Second Motion to Dismiss of the Individual Defendants [325] is **GRANTED.** Defendant James A. Ward's Second Motion to Dismiss [326] is **GRANTED**. Defendant Southern Company's Second Motion to Dismiss [328] is **GRANTED**. The Second Motion to Dismiss of the Director Defendants [329] is **GRANTED.** The Second Motion to Dismiss of the Underwriter Defendants [330] is **GRANTED**. This case is hereby **DISMISSED with prejudice**.

The Court **FINDS** that all parties and all attorneys have complied with all requirements of Rule 11(b) of the Federal Rules of Civil Procedure as to all complaints, responsive pleadings, and dispositive motions filed in this case.

**SO ORDERED** this  7th  day of January, 2009.

**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)